UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| _____ ) | Action No. | |
| JOSH WEBBER ) | | |
| ) | | |
| Plaintiff ) | | |
| v. ) | COMPLAINT | |
| ) | | |
| DAMON ANTHONY DASH ) | | |
| ) | | |
| Defendant ) | | |
| _____ ) | | |

## JURISDICTION

1.      This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. 1332 because: (a) this action is between citizens of different states; and, (b) the matter in controversy exceeds $75,000, exclusive of interest and costs. This Court has personal jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a). Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to this action, including certain unlawful actions alleged herein, and the Defendants conducts business in this District.

## PARTIES

2.      Plaintiff Josh Webber ("Webber") is a California resident with a business address at 5482 Wilshire Blvd. Los Angeles, California 90036.  Webber is the co-director of "Dear Frank" and the film "Never Heard" starring, Robin Givens, Romeo Miller, David Banner, Kandi Burress, Brian White, Karrueche Tran and others, which was theatrically released in 2018.   Webber is an accomplished film director and producer.

1

3.      Defendant Damon Anthony Dash ("Dash") is a Florida resident with an address of 228 McLean Point Winter Haven, Florida 33884.  Dash has caused injury in California and has substantial contacts in the State of California and does business in California.  He is also a member/owner/operator of Poppington LLC, a New York entity with a local California address of 13547 Ventura Blvd., Ste 199, Sherman Oaks, CA 91423.  Dash also is a member/owner/operator of The Dash Group LLC that operates at 13547 Ventura Blvd., Ste 199, Sherman Oaks, CA 91423.

## FACTS

4.      Dash has a history of making false defamatory statements in this District.  One such instance resulted in two defamation judgments against him in _Brown v. Dash_, 20-10676-DSF and _Bunn v. Dash_, 20-7389-DMG, totaling in excess of $150,000.00.

5.      Dash was also found liable for making false statements to the New York City Police Department against his child's mother, Linda Williams ("Williams").  Dash filed a false criminal complaint against Williams, after which Williams filed a civil lawsuit for malicious prosecution against Dash, styled _Williams v Dash_, index number 150119/2010 (New York County Supreme Court).  After trial, the jury awarded Williams $50,000.00 against Dash. See Exhibit A.

6.      Muddy Water Pictures ("MWP") contracted with a writer for the screenplay entitled "The List" with the intent to produce a feature film.  MWP hired Webber to be

the director of the film, and hired Dash as a "vanity director."[1]  Once filming began,

MWP fired Dash because he was disruptive and under the influence of marijuana.

7.      Dash thereafter frivolously claimed that he owned the copyright in "The List"

(later released in film form under the name "Dear Frank") and attempted to market the

film as his own.  MWP and Webber were forced to file a lawsuit in the Southern District

of New York for copyright infringement and defamation of character, styled _Webber v._

_Dash_, 19-cv-610-RWL ("NY Lawsuit")[2].

8.      After a jury trial in the NY Lawsuit in March 2022, Dash was found liable for

copyright infringement and for defaming MWP and Webber.  The false statements for

which Dash was found liable included that Webber stole from Dash, robbed a child, and

was a con man.  The Court confirmed MWP's ownership of the copyright for "The

List/Dear Frank", and MWP and Webber obtained two judgments against Dash in the

amount of $823,000.00.  See Exhibits B and C. Dash's appeal was rejected by the Second

Circuit of Appeals.

9.      Dash is an owner of Roc-A-Fella Records, Inc, with Shawn ("Jay-Z") Carter.  In

February 2024, the Court in the NY Lawsuit ordered that Dash's one-third ownership

interest in Roc-A-Fella Records, Inc. be sold to satisfy the judgments in the NY Lawsuit.

---

[1] A vanity director credit is given to someone whose name is used for marketing the project, but who provides no/minimal services.
[2] Dash filed an affidavit in the NY Lawsuit indicating that he was "hired" by MWP.

10.     On or about March 30, 2024, Dash was a guest on the "Earn Your Leisure"

Podcast ("Podcast").  During the Podcast, Dash told the hosts that Webber stole from him

relating to the film "Dear Frank".  Specifically, Dash stated the following:

> " I had a judgment.  And I knew this dickhead Chris Brown (pause)
> and Josh Webber (pause)  and Muddy Waters…
> Chris Brown the lawyer.  I went through 4 trials with the same lawyer…
>
> What I lost was defamation because these guys trigger me and steal my
> shit...you think there is freedom of speech, it's really not…

(the video will be provided)

11.     The video of the Podcast has been seen over 300,000 times on Instagram and

Facebook, (See Exhibit D) and has over 65,000 views on YouTube.

12.     On or about April 2, 2024, Webber signed a contract with Rebel Entertainment to

direct/produce the film "Fast Life" starring Billy Bob Thorton, Scott Eastwood and

others.  Webber was to be paid Four Million Dollars ($4,000,000.00) to direct and

produce the film.

13.     On April 10, 2024, Rebel Entertainment cancelled Webber's contract, advising

Webber that Dash's accusations of theft were the reason for terminating the agreement.

See Exhibit E.

## COUNT I
## DEFAMATION OF CHARACTER
## AGAINST DASH PURSUANT TO CALIFORNIA LAW

14.     Webber repeats and realleges each of the preceding paragraphs 1-13.

15.     Under California law, the elements of a defamation claim are (1) the defendant made a
statement; (2) it was reasonably understood that the statement was about plaintiff; (3) that the
public reasonably understood the statement to be an accusation that Plaintiff committed a crime;
and, (4) the defendant failed to use reasonable care to determine the truth or falsity of the
statement. See CACI 1704.

16.     While a guest on the Podcast, speaking to hosts Ian and Rashad,  Dash stated that Webber
stole from Dash.

17.     Dash not only failed to reasonable care to ensure the truth of the statement, but he
affirmatively knew that the statement was false because a New York court previously adjudicated
the issue and ruled that MEP owns the copyright in "Dear Frank" Ruling that MWP and Webber
did not steal from Dash.

18.     Dash's statement has harmed Webber, including by causing Rebel Entertainment to cancel
the $4 million director contract into which it entered into with Webber.

19.     Dash's conduct was fraudulent, willful, and/or malicious, and Webber is also entitled to
recover punitive damages. *Civil Code* § 3294.

## PRAYER FOR RELIEF

WHEREFORE, Webber prays for a jury trial and Judgment against Dash as follows:

1.     For damages in the amount of at least $4,000,000, or such other sum according to

proof at trial;

2.      For exemplary and/or punitive damages in amount to be proven at trial;

3.      For interest as allowed by law; and

4.      For cost of suit herein.

JOSH WEBBER
By his Attorneys,

*Dina Adham*
Dina Adham, Esq.
Law Offices of Dina Adham
1230 Rosecrans Avenue, Suite 300
PMB #698
Manhattan Beach, CA 90266
(310) 384 0843
dadham@adhamlawgroup.com

Seeking pro hac vice admission

Christopher Brown
Brown & Rosen LLC
Attorneys At Law
100 State Street, Suite 900
Boston, MA 02109
617-728-9111 (T)
Dated: April 19, 2024      cbrown@brownrosen.com

# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------x

LINDA WILLIAMS,                                                    Index No.

                         Plaintiff,

                                                                  This summons was filed on
          -against-                                               June 2, 2010

DAMON A. DASH,                                                    **SUMMONS**

                         Defendant.
-------------------------------------------------------------------x

TO THE ABOVE-NAMED DEFENDANT:

      YOU ARE HEREBY SUMMONED and required to answer the Verified Complaint in

this action and to serve a copy of your answer on the undersigned within twenty (20) days of

service of this summons, exclusive of the day of service, or within thirty (30) days after service is

complete, if the summons is not served on you within New York State. In case of your failure to

answer, judgment will be taken against you by default for the relief demanded in the Complaint.

      The basis of the venue designated is where the cause of action arose.

Dated: New York, New York
      June 2, 2010

                              ERLANGER LAW FIRM PLLC
                              Attorneys for Plaintiff

                              By: /s/ Robert K. Erlanger
                                  Robert K. Erlanger

                              122 East 42 Street, Suite 519
                              New York, New York 10168
                              (212) 686-8045

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------x

LINDA WILLIAMS,

                    Plaintiff,                    Index No.

      -against-                         **VERIFIED COMPLAINT**

DAMON A. DASH,

                    Defendant.
-----------------------------------------------------------------x

      Plaintiff LINDA WILLIAMS, through her attorneys, the Erlanger Law Firm PLLC, as and for a Verified Complaint against defendant, alleges as follows:

      1.  Plaintiff is a resident of Suffolk County.

      2.  Defendant Damon A. Dash ("Dash") is a resident of New York County.

      3.  Williams and defendant have a son, Damon Dash II ("Dash II").

      4.  On July 5, 2009, 17 year-old Dash II was working as a DJ at a club in Manhattan on July 5, 2009.  Dash learned of this through his assistant who found the information on Facebook.

      5.  Dash arrived at the club and asked Dash II to leave with him.  Once they were outside, there were three or four men waiting by Dash's car.  Dash began to verbally abuse Dash II.

      6.  Dash brought Dash II to a recording studio and then "escorted" him to Dash's apartment in Manhattan.

      7.  Dash II sought to leave the apartment but Dash threatened him and physically prevented him from doing so.  Once Dash fell asleep, Dash II was able to escape.

      8.  On July 14, 2009, plaintiff went to Family Court in New York County to apply for a protective order in Dash II's name to protect him from Dash.

      9.  Plaintiff brought the protective order to the NYPD 1st Precinct for execution but was

told that she had to reapply for a protective order in her name on her son's behalf because he was still a minor.

10.   Dash quickly learned of the protective order application, upon information and belief from the court-appointed law guardian, and flew with wings to the 1st Precinct to file false criminal charges against plaintiff as a pre-emptive strike in anticipation of a protective order being issued against him.

11.   On or about July 15, 2009, Dash knowingly filed a false complaint with the NYPD alleging that: (1) plaintiff had violated a 2001 New Jersey family court protective order in his favor by sending him at least 10 emails between June 1 and July 15, 2009, and (2) the content of these 10 emails harassed him.

12.   Specifically, Dash falsely told NYPD Detective James Lofranco (Shield 05572 of the 1st Precinct Detective Squad) that plaintiff sent him "not less than 10 emails between June 1, 2009 and July 15, 2009" in which she allegedly wrote: 'No wonder your wife left you. You are broke. You have no more money. You don't take care of your son. You are a horrible father for having your son ride a bike instead of paying for him to take a cab. You're a bad father'.

13.   Over the years, Dash had knowingly and repeatedly waived the protections of the 2001 order, thus rendering it of no legal effect, by initiating communications with plaintiff directly and through associates on matters relating to Dash II.

14.   Plaintiff sent Dash no email between June 1 and July 15, 2009, much less 10 such emails, that were intended to harass him or which contained communications that would have been likely to annoy him.

15.   On July 16, 2009, plaintiff returned to the 1st Precinct at around 5:00 p.m. with a

2

protective order she had obtained from the New York Family Court in her name on Dash II's

behalf.

16.    The NYPD sought to serve the protective order on Dash at his residence but he was

allegedly not there.

17.    The police brought the papers back to the 1st Precinct and informed plaintiff that she

had to return on another date with the protective order because the NYPD could not retain the

order to serve it on its own.

18.    Plaintiff left the 1st Precinct with Dash II at around 8:00 p.m., five hours after she

had first arrived.  Detective Lofranco and two female police officers followed them from the

Precinct.  Detective Lofranco stealthily approached plaintiff from behind and assaulted her

without warning.  She felt a sharp pain on her right wrist as Lofranco slapped handcuffs on

(which assault caused damage to plaintiff's right wrist).

19.    Plaintiff was arrested and brought back to the 1st Precinct where she was charged

with criminal contempt in the first degree and aggravated harassment in the second degree, based

on Dash's false complaint.

20.    Plaintiff was arraigned at Central Booking in Manhattan approximately 14 hours

later.

21.    Upon information and belief, Dash never gave copies of the alleged more than 10

mails to either the NYPD or the New York County District Attorney's Office and he failed to file

a signed criminal complaint with the NYPD.

22.    Nonetheless, Dash persisted in prosecuting plaintiff until the false charges against

her were dismissed under CPL 30.30.

## AS AND FOR A FIRST COUNT
### (Malicious Prosecution)

23.    Plaintiff repeats and realleges each and every allegation of Paragraphs 1 through 22 as if more fully set forth herein.

24.    Dash initiated a criminal prosecution against plaintiff without probable cause for: 10 counts of Criminal Contempt in the Second Degree (PL2155.50(3)) and 10 counts of Aggravated Harassment in the Second Degree (PL240.30(1)(a)).

25.    Dash also continued the criminal prosecution against plaintiff without probable cause.

26.    A reasonably prudent person would not have believed that plaintiff was guilty of the crimes charged on the basis of the facts known to Dash at the time the prosecution was initiated and during the time that it was continued.

27.    Dash brought and continued the prosecution for a purpose other than bringing an offender to justice and brought the prosecution out of ill will against plaintiff for seeking to protect her son against Dash's physical abuse.

28.    In initiating and continuing the prosecution against plaintiff, Dash acted maliciously. He was motivated by hatred, ill will, spite or his conduct was wanton, reckless or in willful disregard of plaintiff's rights.

29.    Dash's conduct was entirely reprehensible in that he set out on a deliberate course of conduct to harm plaintiff.

30.    The prosecution against plaintiff terminated in her favor under the speedy trial provisions of CPL 30.30.

31.    As the result of Dash's conduct, plaintiff suffered damages and is entitled to punitive

damages.

32.   The amount of damages sought exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction.

WHEREFORE, plaintiff demands judgment against defendant for compensatory damages in the amount of $1 million, punitive damages, attorneys' fees and costs, and such other and further relief as may be deemed just and proper.

Dated: New York, New York
        June 2, 2010

ERLANGER LAW FIRM PLLC
Attorneys for Plaintiff

By: /s/ Robert K. Erlanger
        Robert K. Erlanger

122 East 42 Street, Suite 519
New York, New York 10168
(212) 686-8045

5

## **AFFIRMATION**

ROBERT K. ERLANGER, an attorney admitted to the bar of the State of New York, does hereby affirm under the penalty of perjury pursuant to CPLR 2106:

I am counsel for plaintiff in this action, and I have read and know the contents of the foregoing Complaint, which are true to my own knowledge, except as to matters alleged upon information and belief, and as to those matters I believe them to be true.

The sources of my information and grounds of my belief as to all matters in the foregoing document not stated to be made upon my knowledge are as follows: plaintiff and documents provided by her.

This Affirmation is made by me because plaintiff does not reside or work in the county where my offices are located, New York County.

Dated: New York, New York
      June 2, 2010

/s/ Robert K. Erlanger
Robert K. Erlanger

SUPREME COURT OF STATE OF NEW YORK
COUNTY OF NEW YORK
Index No.

LINDA WILLIAMS,

Plaintiff,

-against-

DAMON A. DASH,

Defendant.

## SUMMONS and VERIFIED COMPLAINT

**ERLANGER LAW FIRM PLLC**
Attorneys for Plaintiff
122 East 42 Street, Suite 519
New York, New York 10168
Tel. (212) 686-8045

EXHIBIT 2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------------x

LINDA WILLIAMS,

                 Plaintiff,

-against-

DAMON A. DASH,

                 Defendant.

-----------------------------------------------------------------x

Index No. 150119/10

**JUDGMENT**

      This matter having come on for trial before the Honorable Justice Louis B. York and a jury at Part 2 of this Court, held at the Courthouse at 71 Thomas Street, New York, New York, on March 13, 14 & 17, 2014, and the parties having appeared by their respective attorneys, and the issues having been tried, and jury having rendered its verdict on March 17, 2014 in favor of plaintiff and against defendant DAMON A. DASH in the sum of $50,000.00,

      Now, on motion of Erlanger Law Firm PLLC, attorneys for plaintiff, it is

      ADJUDGED that plaintiff Linda Williams, whose address is 65 Biltmore Circle, Huntington, New York 11746, have judgment on the verdict and shall recover of defendant DAMON A. DASH, address currently unknown, the sum of $50,000.00, with interest thereon in the sum of $ 542.47 , together with costs and disbursements as taxed by the clerk, in the sum of $ 1,372.95 dollars, making in all the sum of $ 51,915.42 , and that plaintiff have execution therefor.

      Judgment signed April 30, 2014 at New York New York.

Norman Goodman
                         Clerk

**FILED**

APR 30 2014

COUNTY CLERK'S OFFICE
NEW YORK

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------------x

LINDA WILLIAMS,

                              Plaintiff,                            Index No.  150119/10

        -against-

                                                                    **BILL OF COSTS**
DAMON A. DASH,

                              Defendant.

-----------------------------------------------------------------x

## COSTS

Costs before Note of Issue CPLR 8201(1)                    $ 200.00

Costs after Note of Issue CPLR 8201(2)                     $ 200.00

Costs of Trial  CPLR 8210(3)                               $  300.00
                              Total Costs                  $ 700.00

## DISBURSEMENTS

Fee for Index Number  CPLR 8018(a)                         $ 210.00

Fee for Request for Judicial Intervention  CPLR 8020(a)    $  95.00

Fee for Note of Issue & Jury Demand  CPLR 8020(c)          $  95.00

Motion fees CPLR 8020(a)                                   $   0.00

Expense of taking and making transcripts of deposition
testimony  CPLR 8301(a)(9)                                 $ 232.95

Execution                                                  $ ~~40.00~~ O

Expense for service of summons and complaint  CPLR 8301(d)  $ ~~35.00~~ 40.00
                              Total Disbursements          $ ~~707.95~~ 672.95
                      Total Costs and Disbursements        $~~1,407.95~~ $1,372.95

        I HEREBY CERTIFY THAT I HAVE
        ADJUSTED THIS BILL OF COSTS AT
        $ 1,372.95

            APR 3 0 2014

        Norman Goodman
        CLERK

## ATTORNEY'S AFFIRMATION

The undersigned, an attorney admitted to practice in the courts of the State of New York, affirms under penalty of perjury pursuant to CPLR 2106 as follows:

I am the attorney of record for the plaintiff in this action. The foregoing disbursements have been or will necessarily be made or incurred in this action, and are reasonable in amount. Each of the persons named as a witness attended as a witness on the trial, hearing or examination before trial the number of days set opposite his or her name. Each of those persons resided the number of miles set opposite his or her name from the place of the trial, hearing or examination, and each of those persons necessarily traveled the number of miles set opposite his or her name in traveling to, and the same distance in returning from, the same place of trial, hearing or examination. All copies of documents or papers charged above were actually and necessarily obtained for use in this action. The expenses for services performed other than searches are reasonable in amount, were actually and necessarily expended, and constitute the usual charges made by private persons, although in excess of the fees allowed public officers.

Dated: New York, New York
       April 10, 2014

Robert K. Erlanger

**FILED**

APR 3 0 2014

COUNTY CLERK'S OFFICE
NEW YORK

SUPREME COURT OF STATE OF NEW YORK
COUNTY OF NEW YORK
Index No. 150119/10

LINDA WILLIAMS,

Plaintiff,

-against-

DAMON A. DASH,
Defendant.



**JUDGMENT**

FILED AND DOCKETED
APR 3 0 2014
AT
N.Y., CO. CLK'S OFFICE

**ERLANGER LAW FIRM PLLC**
Attorneys for Plaintiff
122 East 42 Street, Suite 518
New York, NY 10168
(212) 686-8045

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

JOSH WEBBER and                               :
MUDDY WATER PICTURES LLC d/b/a                :
MUDDY WATER PICTURES, INC.,                   :
                                              :          19-CV-610-RWL
                              Plaintiffs,     :
              -against-                       :
                                              :          **SECOND AMENDED**
DAMON ANTHONY DASH and                        :          **JUDGMENT**
POPPINGTON LLC D/B/A DAME DASH                :
STUDIOS,                                      :
                                              :
                              Defendants.     :
_____:

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:    6/21/2022

Whereas on March 30, 2022, the jury rendered a unanimous verdict in favor of Plaintiffs Josh Webber ("Webber") and Muddy Water Pictures LLC d/b/a Muddy Water Pictures, Inc. ("Muddy"), and against Defendants Damon Anthony Dash ("Dash") and Poppington LLC d/b/a Dame Dash Studios ("Poppington") (see Dkt. 265); and

Whereas on June 20, 2022, Plaintiff Muddy filed a letter accepting partial remittitur of punitive damages pursuant to the Court's order and decision resolving Defendants' post-trial motion (see Dkt. 305, 309);

FINAL JUDGMENT is entered against Defendants jointly and severally, as follows:

1.     Muddy is declared to be the sole owner of the film "Dear Frank" aka "The List" pursuant to the United States Copyright Act;

2.     Defendants shall pay the sum of $30,000.00 to Muddy as statutory damages for copyright infringement pursuant to the United States Copyright Act;

3.     Defendants shall pay the sum of $25,000.00 to Muddy as punitive damages for defamation;

1

4.      Defendants shall pay the sum of $400,000.00 to Webber as compensatory damages for defamation;

5.      Defendants shall pay the sum of $250,000.00 to Webber as punitive damages for defamation;

6.      Defendants shall pay post-judgment interest on all amounts awarded at the rate of 1.55% per annum accruing from the date of entry of the judgment pursuant to 28 U.S.C. § 1961;

7.      Defendants shall pay Webber and Muddy a total of $400.00 as costs; and,

8.      Defendants are permanently enjoined from marketing, advertising, promoting, distributing, selling, or copying the film Dear Frank aka The List without Muddy's consent.


Dated: June 21, 2022
New York, New York

                                    SO ORDERED.

                                    _____
                                    ROBERT W. LEHRBURGER
                                    UNITED STATES MAGISTRATE JUDGE

# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
JOSH WEBBER, and                                  :
MUDDY WATER PICTURES LLC d/b/a                    :
MUDDY WATER PICTURES, INC.,                       :
                                                  :
                                                  :
                          Plaintiffs,             :
                                                  :
         - against -                              :
                                                  :
                                                  :
DAMON ANTHONY DASH, and                           :
POPPINGTON LLC d/b/a                              :
DAMON DASH STUDIOS,                               :
                                                  :
                          Defendants.             :
-----------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: __7/14/2022__

19-CV-610 (RWL)

**DECISION AND ORDER:
ATTORNEY'S FEES**

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

Plaintiffs Josh Webber ("Webber") and Muddy Water Pictures LLC ("Muddy")

brought this action against Defendants Damon Anthony Dash ("Dash") and Poppington

LLC ("Poppington") for copyright infringement and defamation. After three years of

litigation and a four-day trial, a jury unanimously found the Defendants liable on both

counts. At the heart of the case was Dash's false claim that he owned a film named "The

List," later known as "Dear Frank" (the "Film"). The jury determined that Muddy, not Dash

or Poppington, is the sole owner of rights in the Film and awarded $30,000 in statutory

damages to Muddy for copyright infringement. Having prevailed, Muddy now seeks

recovery of its attorney's fees expended in litigating the case pursuant to the Copyright

Act, 17 U.S.C. § 505. For the reasons that follow, Defendants' motion is GRANTED, and

Defendants must pay Muddy $117,884.71 in attorney's fees and costs.

1

## Background

The Court presumes the parties' familiarity with the facts and proceedings, which previously have been set forth by the Court in its decision denying summary judgment on the issue of copyright ownership,[1] and in its decision denying Defendants' post-trial motion addressing punitive damages for defamation.[2] The Court sets forth below background to provide sufficient context for the instant decision.

### A.    Factual Background

The dispute between the parties centered on ownership in the Film's copyright, which turned on the parties' intent and their respective contributions. As the evidence clearly showed, and as the jury found, Muddy is the sole owner of the Film's copyright. Indeed, from the outset of the case, Dash was preliminarily enjoined from marketing and promoting the Film, in part due to Plaintiffs' likelihood of success.[3]

Among other evidence presented at trial, the jury learned that Muddy controlled and made decisions on all key aspects of the Film. (Tr. 241-42.[4]) Muddy financed and produced the Film. (Tr. 212, 226.) Muddy provided the script for the Film. (Tr. 28, 220.) Muddy entered into work-for-hire agreements for the Film. (Tr. 212, 215-18.) Muddy, or others working for Muddy, hired the principal actors and production crew. (Tr. 26, 28-29, 212.) Muddy hired Webber to direct and help produce the Film. (Tr. 25, 219.) Muddy

---

[1] *Webber v. Dash*, No. 19-CV-610, 2021 WL 3862704 (S.D.N.Y. Aug. 30, 2021).

[2] *Webber v. Dash*, No. 19-CV-610, 2022 WL 2129025 (S.D.N.Y. June 14, 2022).

[3] *Webber v. Dash*, No. 19-CV-610, 2019 WL 1213008 (S.D.N.Y. Feb. 25, 2019).

[4] Tr." refers to the transcript of the trial, which was held on March 24-25 and 28-30, 2022 (Dkts. 275, 277, 279, 281, 283, 301.) "PX" refers to Plaintiffs' exhibits admitted at trial, and "DX" refers to Defendants' exhibits.

never intended for Dash to be a joint author of the Film, instead retaining Dash for his celebrity cache to serve as "vanity director" and to promote the Film.  (Tr. 41, 226-27, 253.)  Muddy approved final edits to the Film.  (Tr. 230-31.)  Muddy applied for and obtained registration of the Film with the U.S. Copyright Office, making Muddy the presumptive sole owner.  (PX 8; Tr. 214.)

Although Dash disputed much of Muddy's evidence, Dash was thoroughly discredited at trial.  For instance, although he claimed to be at least a co-owner of the Film, Dash was impeached with a sworn declaration he submitted early in the case stating that he was hired by Muddy in return for a percentage of royalties.  (Tr. 434-35; *see* PX 20.)  Dash also was undermined by one of his own texts.  Well over a year after shooting of the Film was complete, Dash sent a text to Webber suggesting that Dash did not believe he owned the Film at all until after it had been made and he realized its value. The exchange reads:

> Webber:  Why do you think you "own" the movie
>
> Dash:  I didn't feel that way until you pulled did this…
> Now I know what I can get for it.
> Way more than 100 grand.[5]

Dash's case, however, was not wholly devoid of support.  Among other contributions, Dash provided his house as one of the locations for shooting the Film (Tr. 91), furnished some wardrobe (Tr. 356), provided use of supplemental camera equipment (Tr. 218), cast two of the actors (Tr. 36, 80-81, 258), and generally provided some

---

[5] (PX 33; Tr. 42-43.)  In issuing its preliminary injunction against Defendants' marketing and distribution of the Film, the Court described Dash's text as "most compelling" and as indicating that Dash sought to turn the Film into a "bargaining chip."  2019 WL 1213008 at *6.

directorial and producing services (Tr. 36-37).  Further, a draft promotional poster for the Film, created before Muddy announced it had parted ways from Dash, identified both Muddy and Poppington as production companies behind the Film, identified Dash as director, and led with the headline, "Dame Dash Presents."[6]  (DX 2; Tr. 250-52.)

During trial, both Webber and Muddy put on overwhelming evidence that the Defendants maliciously defamed them in social media posts that Defendants issued in response to the parties' dispute about who directed and owned the Film.  *See generally* 2022 WL 2129025, at *1-2, 7.

## B.    Procedural Background

Muddy and Webber commenced this action on January 22, 2019.  On February 1, 2019, Muddy moved to preliminarily enjoin Defendants from marketing, advertising, or promoting the Film during pendency of the action.  (Dkt. 11.)  The Court granted the injunction on February 25, 2019.  (Dkt. 46.)  Discovery ensued, and, as discussed in the following section, was protracted by Dash.  At three different junctures, Muddy moved for summary judgment on its copyright ownership claim.  (Dkt. 63, 115, 203.)  The first two motions were denied.  (Dkt. 69, 157.)   The third motion, which came after completion of discovery, was partly successful, with the Court granting summary judgment to Plaintiffs that there was no oral agreement between the parties with respect to the Film, but denying the motion on the question of ownership based on other evidence.  *See* 2021 WL 3862704, at *6-10.

---

[6] Various other pieces of evidence identified Dash as director of the Film, at least in its production phase (*e.g.*, DX 9; Tr. 149-50, 154), but the issue at trial was who authored and owned the Film, not merely who directed it.  Moreover, the jury apparently accepted that Dash was hired by Muddy to be a "vanity director" and for his celebrity status, while Muddy hired Webber to actually direct the Film.  (*See* Dkt. 165.)

A jury trial commenced on March 24, 2022 and concluded on March 29, 2022. The jury returned its verdict on March 30, 2022, finding that Dash and Poppington failed to prove that they were either dominant or joint authors of the Film. (Dkt. 265.) The jury found that both Defendants infringed Muddy's copyright in the Film, although not willfully. The jury awarded Muddy $30,000 in statutory damages, the highest amount permitted for non-willful infringement. See 17 U.S.C. § 504(c)(1). Finally, the jury found both Defendants liable for defaming both Muddy and Webber, awarding Webber compensatory damages in the amount of $400,000 and punitive damages in the amount of $250,000, and finding no compensatory damages for Muddy but awarding Muddy $125,000 in punitive damages.

The Court entered an Amended Judgment on April 11, 2022.[7] (Dkt. 274.) Following entry of the Amended Judgment, Defendants moved for a new trial or remittitur of punitive damages with respect to the defamation verdict. The Court granted the motion in part and denied it in part, and entered the Second Amended Judgment on June 21, 2022. (Dkt. 310.)

## C. Defendants' Litigation Misconduct

Dash's misconduct during this case has been a repeated flash point. He has tried to intimidate Plaintiffs' lawyer, defied court orders, protracted discovery, disrupted attempts to complete his deposition, and repeatedly changed his sworn testimony.

---

[7] The judgment was first amended to address typographical errors. (See Dkt. 272 (Plaintiffs' letter requesting corrections).)

5

### 1.  Dash's Personal Attacks On Plaintiffs' Counsel

At the beginning of the case, Dash emailed Plaintiffs' lawyer, Christopher Brown, threatening "to make an example out of him publicly" by suing him, calling him a "con man" and "dumb ass," and stating that "your law career is over."  (Dkt. 14 at ECF 5.)  In response to an email providing Dash with a copy of a letter filed with the Court, Dash asserted that "I'm suing your punk ass."[8]  (Dkt. 16.)  In a social media post that was an exhibit at trial Dash defamed Brown as a "crooked lawyer" and, along with Plaintiffs, as having robbed a seven-year-old child in connection with a movie.[9]  (PX 5; Tr. 54-55.)

Dash continued his attacks on Brown during discovery, making a mockery of the discovery process at the same time.  At an attempted deposition of Dash on November 21, 2022, Dash responded to questions by levying numerous personal insults against Brown.  For example, in response to the question of where he went to high school, Dash responded:

> Next question.  This ain't got nothing to do with it.  I don't care. I don't want to go through all of this.  He's just trying to run his bill up like a little – like a snarky little lawyer like he is, and ask me stupid questions, and waste my time.  I don't mind.   You can show the judge this.

(Dash Depo. I at 8-9.[10])

---

[8] In a memo endorsement on an early request by Dash for an extension of time, the presiding judge at the time, then Chief Judge McMahon, commented that "as evidenced by emails he inadvertently sent to chambers, [Dash] is indeed being 'difficult and unprofessional.'" Dkt. 21 (quoting language attributed by Dash's lawyer to Plaintiffs' lawyer Brown).

[9] Brown successfully sued Dash for defamation in California federal court. *Brown v. Dash*, No. CV 20-10676, 2021 WL 4899021(C.D. Cal. Sept. 29, 2021).

[10] "Dash Depo. I" refers to the Transcript Of Deposition Of Damon Dash, Nov. 21, 2019, attached as Ex. A to Affidavit Of Christopher Brown dated June 7, 2021 (Dkt. 214) ("7/7/2021 Brown Aff.").

When Brown explained that Dash should let him know if at any point Dash does

not understand a question, Dash interjected:

> I don't understand why you're trying to rob me, and why you're
> representing everybody, because you're a clown. That's my
> question. What you here for? You're trying to protect your
> own hide.

(*Id.* at 11-12.)

During a lawyer colloquy, when Mr. Brown said "We can't all speak at the same

time," Dash interrupted:

> This gives you no power. It just makes you look stupid. I'm
> going to ruin you as a lawyer. You'll never be a lawyer again.
> …. I'm just giving you rope to hang yourself. You're going to
> be in a whole nother courtroom, in a whole nother place.

(*Id.* at 19.)

Other examples of Dash's taunting include: Brown "has no kids, I bet. If he do,

they sick with him" (*id.* at 20); "You're less of a man. Everybody laughs at you" (*id.*); "You

should be disgusted with yourself, Black people like you who don't care about other

people" (*id.* at 21); "you look silly, and you have a stupid-looking collar on your sweater"

(*id.* at 62); "your face looks crazy" (*id.* at 65); "I'm laughing at you" (*id.* at 66); "You're a

joke. I'm enjoying this shit" (*id.*); and so on.

### 2. Dash's Willful Failure To Comply With Discovery And Court Orders

Dash failed to respond to Plaintiffs' very first set of document requests,

interrogatories, and notice of deposition. On May 28, 2019, the Court held a hearing and

found that Defendants willfully failed to respond to the demands; defense counsel even

conceded that Defendants had no excuse. (Dkt. 74.) The Court also imposed deadlines

for Defendants to comply with discovery obligations and warned that failure to comply could result in sanctions. (*Id.*)

Dash did not comply. As the Court found at a show cause hearing held on July 10, 2022, Dash willfully did not comply with the Court's May 28, 2019 order by failing to timely provide discovery responses and documents and canceling his deposition just three days before the date to which counsel previously had agreed. (*See* Dkts. 77, 78, 88.) The Court imposed monetary sanctions on Defendants and defense counsel jointly for violating the Court's orders and unnecessarily causing Plaintiff to incur costs to obtain relief from the Court. (Dkt. 88.)

The parties next arranged for Dash's deposition to take place on October 10, 2019. On October 7, 2019, however, again only three days before the date previously agreed upon, counsel for Dash informed Plaintiffs' counsel that Dash again would not be attending his deposition. (*See* Dkt. 99.) On October 15, 2019, the Court set a date for another hearing at which Dash would be required to show why he should not be sanctioned for failing to appear at his deposition on the agreed-upon date. (Dkt. 100 ¶ 1.) The Court's order also required that Dash make himself available to be deposed on a day preceding the hearing date. (*Id.* ¶ 2.)

Dash finally appeared, thirty minutes late, for his deposition on November 21, 2019. (*See* Dkt. 102.) However, as described above, he used the deposition as a platform to launch insults against Plaintiffs' counsel. And with less than an hour into the deposition, Dash became sufficiently unruly that the local law firm hosting the deposition terminated the deposition and called 911 to have Dash removed from the building. (*See* Dkts. 102, 131.)

Accordingly, at the show cause hearing held on November 22, 2019 (the day after the deposition fiasco), the Court sanctioned Dash by requiring him to pay costs for his "repeated disregard of court orders and highly inappropriate conduct during his November 21, 2019 deposition." (Dkt. 103.) On February 10, 2020, the court again ordered Dash to appear for continuation of his deposition and that he pay all costs associated with the deposition on February 10, 2020. (Dkt. 131.) As the Court observed: Dash has "repeatedly obstructed the discovery process, engaged in conduct warranting imposition of sanctions, and otherwise demonstrated disregard for the orderly administration of justice." (*Id.*)

Unfortunately, Dash did not reform his behavior. The fourth attempt at Dash's deposition was scheduled for November 20, 2020. But ten days before that, Dash once again cancelled the taking of his deposition. (*See* Dkt. 165.) Despite Plaintiffs' reasonable request for terminating sanctions, the Court provided Dash "a last and final opportunity" to complete his deposition, requiring it to be completed by the end of January 2021. (Dkt. 175.)

Once again, however, Dash managed to frustrate completion of his deposition. The deposition had to be terminated because other participants, including the court reporter, could not sufficiently hear what Dash was saying. (*See* Dkt. 186.) Whether that was due to purposeful conduct, however, was unclear. As the Court noted, "the fact that [Dash] was the only person involved in the deposition who could not be clearly heard is highly suspect. That said, the court cannot conclude … that the problems with Dash's audibility were intentionally caused by Dash purposefully speaking in a low voice behind the two masks he was wearing." (Dkt. 187.)

Dash finally appeared, by remote means, for completion of his deposition on March 15, 2021. Even then, Dash continued to frustrate matters by refusing to answer questions on a subject – Defendants' recent asset transfers – the Court expressly directed was an appropriate subject for deposition. (*See* Dkts. 181, 193, 194, 198.)

Dash not only repeatedly violated orders concerning discovery; he also violated the preliminary injunction by failing to remove social media postings that marketed and promoted the Film. (Dkts. 143, 147.)

### 3. Dash's Shifting Sworn Testimony

Dash also has exhibited misconduct by repeatedly changing his sworn testimony about his purported role and ownership in the Film.

At the outset of the case, in opposing Muddy's motion for a preliminary injunction in February 2019, Dash averred that he "was hired" by Muddy to direct and produce the Film "in return for a 25% net interest in the Film's royalties (which I was to co-own, in perpetuity)." (Dash Decl. I at ¶ 20.[11]) Dash conceded that there was no written agreement, contending instead that he and Muddy had a verbal agreement. (*Id.* at ¶¶ 20, 22.) Shortly after the Court granted Muddy's motion, Dash again asserted, by way of counterclaim, the same verbal agreement by which he "was hired" by Muddy. (Answer and Counterclaim (Dkt. 48) at ¶ 16.) This time, however, Dash omitted the phrase "in perpetuity."[12]

---

[11] "Dash Decl. I" refers to the Declaration of Damon Dash dated Feb. 11, 2019 (Dkt. 26).

[12] A likely explanation for Dash's omission of the phrase "in perpetuity" is that just two days earlier the Court granted Muddy's motion for a preliminary injunction based, in part, on having held that the oral agreement for royalties in perpetuity asserted by Dash was unenforceable under the statute of frauds. (Dkt. 46 at 12.)

About a year later in both February (in response to Muddy's second motion for summary judgment as to defamation) and March 2020 (in response to Muddy's second motion for summary judgment as to authorship and ownership), Dash submitted declarations describing an oral agreement with Muddy much different from the one he first described in February 2019.  Instead of saying he "was hired" by Muddy, Dash asserted that "it was agreed by [Muddy] that I would direct and produce the film" in return for the same 25% net interest in the film's royalties and co-ownership.[13]  (Dash. Decl. II at ¶ 3; Dash Decl. III at ¶ 18.)  According to Dash, his agreement with Muddy "was conditioned on there being a $250,000 budget which I was promised," even though his earlier declaration and counterclaim did not mention any such condition.  (*Id.*)  Dash also newly asserted that the "original verbal agreement/promise" was made by someone named Tony White, who worked for Muddy.  (Dash Decl. II at ¶¶ 3-4; Dash Decl. III at ¶ 18.)  Dash avowed that White offered him White's own 25% interest in the Film and that Muddy's principal, Mike Muntaser, "acquiesced and ratified this verbal agreement," thus giving Dash a total of 50% interest in the Film. (Dash Decl. II at ¶ 6; Dash Decl. III at ¶ 20.)  Even further, according to Dash, Muddy promised Dash "total creative control." (Dash Decl. II at ¶ 6; Dash Decl. III at ¶ 21.)

In deposition testimony, however, Dash denied the existence of a written or oral agreement with Muddy.  In the first installment of his deposition taken on November 21, 2019, Dash testified: "The nature of my relationship with Muddy was never ever, ever articulated."  (Dash Depo. I at 39.)  And in January 2021, Dash testified that he did not

---

[13] "Dash Decl. II" refers to the Declaration of Damon Dash dated Feb. 18, 2020 (Dkt.136); "Dash Decl. III" refers to the Declaration of Damon Dash dated March 4, 2020 (Dkt. 148).

recall any agreement with Muddy "at all." (Dash Depo. II at 15.[14])  Dash also admitted that he did not even meet Muntaser "until after the whole movie was shot." (Dash Depo. I at 39-40; *see also* Dash Depo. III at 46 ("Again, my acknowledgement of Muddy is after the film was shot, not before").[15])

In opposing Muddy's third motion for summary judgment, however, Dash reversed course, asserting that a verbal agreement was made between Muddy and Dash. In support of that contention, however, he relied on the same February 2020 declaration submitted to the Court before his 2021 re-admission noting that there was no agreement. (Defendants' Rule 56.1 Response (Dkt. 213) at ¶¶ 4, 18-20.)

Then, at trial, Dash once again denied being hired by Muddy.  Confronted with his initial declaration in the case in which he affirmatively stated he had been hired by Muddy, Dash strained credulity, claiming he "must not have understood it"; then claiming "I have problems with my eyes.  I just got cataract surgery.  I just read e-mails.  I get the gist of it"; and then claiming, "It must have been a mistake."  (Tr. 434-36.)

**Discussion**

**I.      An Award Of Attorney's Fees Is Warranted In This Case**

In a copyright action, a court "in its discretion may allow the recovery of full costs … [and] may also award a reasonable attorney's fee to the prevailing party as part of the costs."  17 U.S.C. § 505.  It is beyond dispute that Muddy is a prevailing party under

---

[14] "Dash Depo. II" refers to the Transcript Of Deposition Of Damon Dash, Jan. 29, 2021, attached as Ex. C to 7/7/2021 Brown Aff.

[15] "Dash Depo. III" refers to the Transcript Of Deposition Of Damon Dash, March 15, 2021, attached as Ex. D to 7/7/2021 Brown Aff.

Section 505.  The jury found that Muddy is the sole owner of the copyright in the Film, that neither Defendant is a joint owner of the Film, and that Defendants are liable for copyright infringement.

As for the factors considered in determining whether to award attorney's fees pursuant to Section 505:

> The Supreme Court has identified 'several nonexclusive factors' to guide district courts in exercising their discretion under section 505, including frivolousness, motivation, objective unreasonableness, and the need in particular circumstances to advance considerations of compensation and deterrence." *Kirtsaeng v. John Wiley & Sons, Inc.*, 579 U.S. 197, 202 (2016) (alterations adopted) (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n.19 (1994)); *see also Manhattan Rev. LLC v. Yun*, 765 F. App'x 574, 576 (2d Cir. 2019). "Although objective reasonableness carries significant weight, courts must view all the circumstances of a case on their own terms, in light of the Copyright Act's essential goals." *Kirtsaeng*, 579 U.S. at 209.  Courts may award fees even without a finding of unreasonableness "because of a party's litigation misconduct" or "to deter repeated instances of copyright infringement or overaggressive assertions of copyright claims." *Id*.  A court may also consider other factors, so long as they are consistent with the Copyright Act's "purpose of enriching the general public through access to creative works," striking a balance between encouraging authors' novel creations and enabling others to build upon that creative work. *Fogerty*, 510 U.S. at 527.

*Capitol Records, LLC v. ReDigi Inc.*, No. 12-CV-95, 2022 WL 1046463, at *3 (S.D.N.Y. Apr. 7, 2022) (Sullivan, J., sitting by designation).  Consideration of those factors in this case well supports awarding reasonable attorney's fees and costs to Muddy.

Defendants' primary contention – that they were the dominant authors and thus sole owners, or at least joint authors and thus co-owners, in the Film – comes close to

13

being objectively unreasonable.[16]   "'Objective unreasonableness' is generally used to describe claims that have no legal or factual support." *Viva Video, Inc. v. Cabrera*, 9 F. App'x. 77, 80 (2d Cir. 2001); *see also Muller v. Twentieth Century Fox Film Corp.*, No. 08-CV-2550, 2011 WL 3678712, at *1 (S.D.N.Y. Aug. 22, 2011) ("A copyright infringement claim is objectively unreasonable when the claim is clearly without merit or otherwise patently devoid of legal or factual basis." (internal quotation marks omitted)).

On summary judgment, this Court determined that there were issues of disputed fact material to determining whether Defendants and Muddy mutually intended to be co-authors, or, if not, who is the dominant author of the Film.  *See Thomson v. Larson*, 147 F.3d 195, 200 (2d Cir. 1998) (a co-authorship claimant bears the burden of establishing that each of the putative co-authors (1) made independently copyrightable contributions to the work; and (2) fully intended to be co-authors); *16 Casa Duse, LLC v. Merkin*, 791 F.3d 257, 260 (2d Cir. 2015) (where two or more parties each contribute the requisite degree of expression to a work but do not mutually intend to be co-authors, the "dominant" author of the work is deemed the work's sole author).

More particularly, the Court found genuinely disputed facts concerning the parties' intent and each party's contributions to the Film. To be sure, the evidence in Muddy's favor at summary judgment was strong.  Among other evidence, Muddy entered into the contracts with cast and crew; Dash's first sworn declaration in the case stated that he was "hired" by Muddy; and Dash essentially conceded in a text message that he was holding

---

[16] "A district court that has ruled on the merits of a copyright case can easily assess whether the losing party advanced an unreasonable claim or defense." *Kirtsaeng,* 579 U.S. at 207, 136 S. Ct. at 1987.  The Court has intimate familiarity with the merits of the claims in this case having both ruled on summary judgment and presided over trial.

up distribution of the Film because he newly realized its potential value. Defendants, on the other hand, offered materials Dash received from Muddy in which he was billed as director and Dash's production company logo appears along with Muddy's. As the Court commented, "Although Dash's evidence may be thin, and belied by his own words and contradictions, it is enough to create a genuine dispute regarding whether the parties fully intended to be co-authors." 2021 WL 3862704 at *9.

Similarly, the Court found conflicting evidence with respect to the parties' contributions to the Film. Muddy put forward evidence that he was the executive producer of the Film, hired Webber who directed the Film, and paid to produce the Film, while Dash did not materially contribute and was high on set and disruptive. Dash submitted evidence that he provided his house for the main set and shooting location, contributed camera equipment for filming, and to some extent provided input on the script, coaching of the actors, and editing of the Film.

At trial, the same proof, and more, was presented. In testifying, Dash came across as dishonest and predatory.[17] The jury clearly did not believe him, and found in favor of Muddy. From an objective viewpoint, the odds were highly stacked against Defendants,

---

[17] *See*, *e.g.*, Tr. 434-36 (Dash dissembling in an effort to escape his previously having admitted that he was hired by Muddy), Tr. 467 (impeaching Dash about deposition testimony claiming he paid for everything for the Film except the edits), 472-73 (Dash contradicting himself, saying "we never really agreed to anything" but then claiming there was a "conceptual agreement"); Tr. 31-32, 101-02 (Dash making principal actress uncomfortable "from day one" by, inter alia, urging her to watch pornography to prepare for a scene); Tr. 131-37 (Dash threatening and "blackmailing" the principal editor of the Film).

Case 2:23ase-0127-8-JP06-10PRWLD Document 1 319 Filed 04/22/24/22 Page 40 of 51 23 Page ID #:40

and the Court finds that Defendants' contentions came right up to the line of unreason. But the Court does not find that Defendants crossed that line.[18]

Nonetheless, other relevant factors strongly weigh in favor of awarding attorney's fees. In particular, Defendants' litigation misconduct and the interest in deterrence, strongly weigh in favor of granting attorney's fees to Muddy.[19]

As recounted in the factual background above, Dash repeatedly engaged in misconduct throughout this case. He derailed discovery by cancelling his deposition multiple times. When he was deposed, he used his deposition as a platform to mock and harangue Plaintiffs' counsel. He violated multiple court orders regarding his discovery obligations. He repeatedly dissembled, modifying his sworn testimony to what was most expedient at the moment. All of these, independently and together, constitute litigation misconduct. *See*, *e.g.*, *Capital Records LLC v. ReDigi, Inc.*, No. 12-CV-0095, 2022 WL 1046463, at *7 (S.D.N.Y. April 7, 2022) (awarding attorney's fees due in part to

---

[18] For the same reasons, the Court does not find Defendants' contentions to have been "frivolous." A claim "is frivolous when there 'is indisputably absent any factual or legal basis' " for it. *Hallford v. Fox Entertainment Group, Inc.*, 12-cv-1806, 2013 WL 2124524, at *1 (S.D.N.Y. Apr. 18, 2013) (quoting *Neitzke v. Williams*, 490 U.S. 319, 323, 109 S.Ct. 1827, 1830 (1989)). "Frivolousness is a distinct factor from objective unreasonableness, and although the line between the two is not always well defined, it is generally considered a particularly intense form of objective unreasonableness." *Latin American Music Co., Inc. v. Spanish Broadcasting Systems, Inc.*, No. 13-CV-1526, 2020 WL 2848232, at *3 (S.D.N.Y. June 1, 2020) (internal quotation marks and citation omitted).

[19] As for the "compensation" factor, the evidence is equivocal. On the one hand, Muddy financed the entirety of the Film, and Defendants' assertion of competing rights over the Film compromised Muddy's ability to market and distribute the Film. (See PX 13; Tr. 236-39 (loss of sponsorship deal due to Dash).) The jury awarded $30,000 in statutory damages for Defendants' infringement, but that award does not account for damages, if any, due to Defendants' assertion of ownership. On the other hand, Muddy ultimately was able to license the Film to a streaming service for $75,000 (Tr. 332), and although the initial budget for the Film was $250,000 (Tr. 249, 301-02), it is not evident how much Muddy actually spent on the Film.

defendant's shifting assertion of facts and "burdensome stall tactics"); *Latin American Music Co.*, 2020 WL 2848232, at *5 (awarding attorney's fees due in part to "unreasonable conduct, including during discovery and through trial, which concededly made life more difficult for [the opposing party] (and the Court)") (internal quotation marks omitted); *John Wiley & Sons, Inc. v. Book Dog Books*, *LLC*, 327 F. Supp.3d 606, 643 (S.D.N.Y. 2018) (awarding attorney's fees due in part to defendant's "discovery evasions").

The need for deterrence also supports awarding attorney's fees in this case, which is not the first time that Dash has wrongfully asserted copyright ownership in a film. Even before the verdict against Dash here, Defendants were found liable for marketing a film that they worked on but to which they did not own the copyright. *Brooks v. Dash*, 454 F. Supp.3d 331 (S.D.N.Y. 2020). In *Brooks*, as the jury did here, the court rejected Dash's contentions that he was a co-author or dominant author of the Film. *Id.*, 454 F. Supp.3d at 338. As could be said equally about this case, Judge Rakoff found that Dash's testimony in *Brooks* was "self-serving" and "lacked credibility." *Id.* Dash's recidivism calls for deterrence. *See Kirstaeng*, 579 U.S. at 209, 136 S. Ct. at 1989 (court may award attorney's fees "to deter repeated instances of copyright infringement or overaggressive assertions of copyright claims, again even if the losing position was reasonable in a particular case") (citing *Bridgeport Music, Inc. v. WB Music Corp.*, 520 F.3d 588, 593-95 (6th Cir. 2008)); *Latin American Music Co.*, 2020 WL 2848232 at *4 (finding in copyright infringement case that "[t]he case for specific deterrence is particularly strong" against plaintiffs who had brought similar claims in the past). The *Brooks* court did not award attorney's fees for the copyright claim because the infringement at issue started before

the registration of Brooks' copyright. *Brooks*, 454 F. Supp.3d at 340; *see* 17 U.S.C. § 412 (barring attorney's fees for infringement of copyright in unpublished work commenced before effective date of registration). A deterrent thus has not been previously imposed. There is thus all the more reason to award attorney's fees here as a deterrent to further such conduct.

Having found that awarding attorney's fees is warranted, the Court now turns to determining the amount of those fees.

## II. The Amount Of Reasonable Fees

Muddy seeks recovery of $112,055.00 in attorney's fees. (Brown Aff.,[20] Ex. A at 7.) Although Defendants oppose awarding attorney's fees at all, they have not contested the amount of fees sought. Even so, the Court finds that the fees submitted by Muddy are reasonable.

The traditional approach to determining a fee award is the "lodestar" calculation, which is the number of hours expended multiplied by a reasonable hourly rate. *See Healey v. Leavitt*, 485 F.3d 63, 71 (2d Cir. 2007); *Tackie v. Keff Enterprises LLC*, No. 14-CV-2074, 2014 WL 4626229, at *6 (S.D.N.Y. Sept. 16, 2014). The Second Circuit has held that "the lodestar … creates a 'presumptively reasonable fee.'" *Millea v. Metro-North Railroad Co.*, 658 F.3d 154, 166 (2d Cir. 2011) (quoting *Arbor Hill Concerned Citizens Neighborhood Association v. County of Albany*, 522 F.3d 182, 183 (2d Cir. 2008); and then citing *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 552, 130 S. Ct. 1662, 1673 (2010)); *see also Stanczyk v. City Of New York*, 752 F.3d 273, 284-85 (2d Cir. 2014)

---

[20] "Brown Aff." refers to the Affidavit Of Christopher Brown In Support Of Motion For Legal Fees filed on June 15, 2022 (Dkt. 308.)

(reaffirming *Millea*).  To arrive at a lodestar calculation, "[t]he party seeking an award of [attorney's] fees should submit evidence supporting the hours worked and rates claimed." *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S. Ct. 1933, 1939 (1983).  Plaintiff has submitted such evidence here, including a declaration from counsel along with billing records.  (Brown Aff. and Ex. A.)

**Hourly Rates:**  Courts assess the reasonableness of a proposed hourly rate by considering the prevailing market rate for lawyers in the district in which the ruling court sits.  *Polk v. New York State Department of Correctional Services*, 722 F.2d 23, 25 (2d Cir. 1983).  "The rates used by the court should be current rather than historic hourly rates."  *Reiter v. Metropolitan Transportation Authority Of New York*, 457 F.3d 224, 232 (2d Cir. 2006) (internal quotation marks omitted).  "[C]ourts may conduct an empirical inquiry based on the parties' evidence or may rely on the court's own familiarity with the rates if no such evidence is submitted."  *Wong v. Hunda Glass Corp.*, No. 09-CV-4402, 2010 WL 3452417, at *2 (S.D.N.Y. Sept. 1, 2010) (internal quotation marks omitted). Additionally, "the range of rates that a plaintiff's counsel actually charges their clients … is obviously strong evidence of what the market will bear."  *Rozell v. Ross-Holst*, 576 F. Supp. 2d 527, 544 (S.D.N.Y. 2008); *see also Lilly v. County of Orange*, 910 F. Supp. 945, 949 (S.D.N.Y. 1996) ("The actual rate that counsel can command in the market place is evidence of the prevailing market rate").

Plaintiff is represented in this action by Christopher L. Brown of Brown & Rosen LLC, a small firm located in Boston, Massachusetts.  Brown single-handedly litigated the instant case, charging $500.00 per hour in 2019 and 2020, and $550.00 per hour in 2021 and 2022.  Brown has been licensed to practice law in New York as well as

Massachusetts for over twenty years. (Brown Aff. ¶ 2.) Among other relevant experience, Brown has litigated commercial, entertainment, and intellectual property cases, including in New York. (*Id.* ¶ 4.) Brown's experience even includes litigating other cases against Dash and Poppington. *See, e.g.*, *Brown v. Dash*, 2021 WL 4899021 (awarding Brown partial summary judgment against Dash on defamation claim); *Brooks*, 454 F. Supp.3d 331 (after bench trial, finding Dash and Poppington liable for copyright infringement).

The Court finds the rates charged for the work on this case are reasonable. They are consistent with rates charged for similar litigation in the New York metropolitan area. *See, e.g.*, *Latin American Music Co.,* 2020 WL 2848232 at *6 (observing that courts in copyright cases consider reasonable rates of $400 to $750 an hour for partners) (citing, inter alia, *Broadcast Music, Inc. v. Pamdh Enterprises, Inc.*, No. 13-CV-2255, 2014 WL 2781846, at *6-7 (S.D.N.Y. June 19, 2014) (approving hourly rates of $570 for partner with 15 years' experience in copyright law); *Pyatt v. Raymond*, 10-CV-8764, 2012 WL 1668248, at *6 (S.D.N.Y. May 10, 2012) (collecting cases approving rates ranging from $400 to $650 for partners in copyright and trademark cases). And Brown brought added value to the case given his experience litigating other cases against Defendants.

**Hours Worked:** To determine properly compensable hours, "the court must examine the hours expended by counsel and the value of the work product of the particular expenditures to the client's case." *Tlacoapa v. Carregal*, 386 F. Supp. 2d 362, 371 (S.D.N.Y. 2005) (citing *Gierlinger v. Gleason*, 160 F.3d 858, 873, 876 (2d Cir. 1998)). "In making this examination, the district court does not play the role of an uninformed arbiter but may look to its own familiarity with the case and its experience generally as well as to the evidentiary submissions and arguments of the parties." *Gierlinger*, 160 F.3d

20

at 876. "The relevant issue ... is not whether hindsight vindicates an attorney's time expenditures, but whether, at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures." *Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir. 1992); *see also Mugavero v. Arms Acres, Inc.*, No. 03-CV-5724, 2010 WL 451045, at *6 (S.D.N.Y. Feb. 9, 2010) (same). A court thus should exclude from the lodestar calculation "excessive, redundant or otherwise unnecessary hours." *Quaratino v. Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir. 1999); *see also Luciano v. Olsten Corp.*, 109 F.3d 111, 116 (2d Cir. 1997) ("If the district court concludes that any expenditure of time was unreasonable, it should exclude these hours from the lodestar calculation"). However, a prevailing party need not achieve success on every motion to recover time devoted to such motion. *Gortat v. Capala Brothers, Inc.*, 621 F. App'x. 19, 23 (2d Cir. 2015) ("there is no rule that [p]laintiffs need achieve total victory on every motion in pursuit of a successful claim in order to be compensated for the full number of hours spent litigating that claim").

The time records submitted reflect that Muddy's attorney worked a total of 218.3 hours in connection with Muddy's copyright claim. (Brown Aff. ¶ 10 and Ex. A.) Importantly, the hours for which Muddy seeks recovery are those necessary to only the copyright claim; they do not include time devoted to the defamation claims. (*Id.* ¶¶ 8-10 and Ex. A at 1 (billing "[r]edacted and revised to remove services related to defamation claim").) The Court has reviewed the records and finds the time spent to be reasonable. The work performed is of the nature and type that would be expected for a copyright ownership and infringement case such as this one that proceeded all the way through trial. The case lasted over three years; it started with Muddy's successful motion for a

preliminary injunction; proceeded through discovery, which was protracted by Dash's misconduct; included summary judgment briefing, albeit only partially successful; required trial preparation and submissions; and culminated in four days of trial. The total number of hours reflects substantial efficiency given the amount of work involved.[21]

The billing records submitted are not exemplary. They contain block billing – a practice disfavored in this District – with multiple tasks listed together for the same day and even over the course of several days.[22] Additionally, it is not apparent whether any of the work billed at Mr. Brown's rates is work that could more cost-effectively have been performed by a more junior attorney, paralegal, or administrative staff. But, notwithstanding those lapses, the total time expended by Brown alone is quite reasonable, again reflecting counsel's efficiency and experience. And, as also noted, Defendants have not contested the amount of fees sought. Having determined that the fees sought are reasonable, the Court finds that Plaintiff should be awarded attorney's fees in the amount of $112,055.

### III.   Costs

Muddy seeks $5,829.71 in costs for three groups of expenditures:  creation and mailing of trial exhibit books ($150.00); hotel ($1,163.93) and parking ($300.00) during

---

[21] Not all of Plaintiffs' pre-trial efforts were successful – they moved for summary judgment on multiple occasions and pursued termination sanctions aggressively – but that lack of success does not countenance deduction of fees incurred in connection with those efforts. *Gortat*, 621 F. App'x. at 23. Moreover, many of Plaintiffs' applications were made through efficient use of letter motions rather than full-blown briefing.

[22] *See*, *e.g.*, *Congregation Rabbinical College of Tartikov, Inc. v. Village of Pomona*, 188 F. Supp.3d 333, 340 (S.D.N.Y. 2016) ("courts look unfavorably on block billing and vagueness in billing because imprecise entries limit their ability to decipher whether the time expended has been reasonable") (internal quotation marks, brackets, and citation omitted).

trial; and trial transcript fees ($4,215.78). (Brown Aff., Ex. A at 7.) "[I]t is well-established that the expenses recoverable under fee-shifting statutes … are not limited to the costs taxable under 28 U.S.C. § 1920 and Local Civil Rule 54.1." *Garcia v. City of New York*, No. CV 11-2284, 2013 WL 5574507, at *9 (E.D.N.Y. Oct. 9, 2013). Fee awards thus "'normally include those reasonable out-of-pocket expenses incurred by the attorney and which are normally charged fee-paying clients.'" *Trustees of N.Y.C. District Council of Carpenters Pension Fund, Welfare Fund, Annuity Fund v. B&L Moving & Installation, Inc.*, No. 16-CV-4734, 2017 WL 4277175, at *8 (S.D.N.Y. Sept. 26, 2017) (quoting *Reichman v. Bonsignore, Brignati & Mazzotta P.C.*, 818 F.2d 278, 283 (2d Cir. 1987)), *R. & R. adopted*, 2018 WL 705316 (S.D.N.Y. Feb. 5, 2018). The Court has reviewed Plaintiff's submissions and finds the costs set forth are reasonable and recoverable. Accordingly, Plaintiff should be awarded $5,829.71 in costs.

## Conclusion

For the foregoing reasons, Plaintiffs' motion is GRANTED. Defendants shall pay Plaintiffs $117,884.71 in reasonable attorney's fees and costs.

SO ORDERED.

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated: July 14, 2022
    New York, New York

# EXHIBIT D



# EXHIBIT E

**From:** Rock Jacobs <rock@rebelentertainment.media>
**Date:** April 10, 2024 at 4:39:59 PM PDT
**To:** "Josh A. Webber" <josh@webberfilms.com>
**Subject: Re: Fast Life Feature Film**

Hey Josh,

Sorry for the radio silence.  Our investor has raised serious concerns about recent allegations involving you and Damon Dash, which have surfaced in various media outlets.

Specifically, our investor came across an interview on "Earn Your Leisure" where your name was mentioned in connection with allegations of theft from Damon Dash and a significant lawsuit involving Chris Brown. While I haven't had the opportunity to delve deeply into these allegations, initial online searches do not paint a favorable picture.

As you can understand, our investor, being a family-oriented individual, is adamant about not associating his name or the project title with any controversial matters.

Regrettably, based on the findings outlined above, I must officially terminate our agreement. Please accept this as formal written notification of our decision.

I want to emphasize that this decision is not within my control; rather, it stems from our investor's stance, as they are the primary funder of the project.

I sincerely regret any inconvenience or disappointment this may cause, Josh and hope that we can remain friends and I wish you the best of luck in your future endeavors.



Rock Jacobs  |  Founder
RE  |  Beverly Hills, CA 90212
View IMDB www.rebelentertainment.media

Confidential and Privileged Communication Notice: This communication, including attachments, is intended solely for the use of the intended recipient(s) and contains information that is privileged, confidential or proprietary. Please be advised that any unauthorized distribution or copying of this is prohibited. If you are not an intended recipient, please notify the sender, and delete and destroy all copies and attachments. Unless expressly indicated, this communication does not serve to conduct a transaction or make any agreement by electronic means. Thank you for your cooperation.